1
2

Donald J. Farber, Esq. (SBN 168837)
Law Office of Donald J. Farber
San Rafael, CA 94901
Ph. (415) 497-1685/Fax (415) 472-7182
Email: n3dgt@AOL.com

3
4
5
6

## UNITED STATES DISTRICT COURT

7
8

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND DIVISION)

9

| | |
|---|---|
| 10  PARENT AND GUARDIAN "SML" ON BEHALF OF MINOR SON "JM" 11  ("STUDENT")   ("SML EX REL JM), 12    Plaintiff, 13  vs. 14 15  MILLER CREEK SCHOOL DISTRICT ("MILLER CREEK" OR "DISTRICT"), 16  SAN RAFAEL, CA , 17    Defendant 18  AND DOES 1-20. | Case No.: **Complaint** **(1)   REQUEST FOR DECLARATORY JUDGEMENT.** **(2)   APPEAL OF OAH FAPE SPECIAL EDUCATION CASE 2022060347 RE DUE PROCESS AND 20 USC § 1400 et seq** |

19

### I.      Nature of Action

20

1.  This action appeals California Office of Administration Hearings ("OAH") case

21
22

2022060347 denying relief to parent SML on behalf of her son JM handed down in two

23

decisions, the first on July 21, 2022 on "expedited" matters under 20 USC § 1415(k) and

24

the second on "non-expedited" matters handed down September 6, 2022, both under 20

25

USC § 1400 et seq (*Individual Disabilities Education Act ("IDEA" or "Act")*.

26

### JURISDICTION

27

28

2.  Federal question jurisdiction lies herein with 28 USC §§ 1331, 1343 and 29 USC §

COMPLAINT - 1

794(a) and, as applicable, 28 USC § 1367.

## VENUE

3.  Venue is proper in this district in accordance with 28 USC § 1391 in that all relevant actions occurred therein.

## PARTIES

4.  Plaintiff "JM" and his natural mother and sole legal guardian "SML" reside in San Rafael, California and within the Miller Creek School District.

5.  Defendant Miller Creek School District lies within the boundaries of San Rafael, California.

## ADMINISTRATIVE REMEDIES EXHAUSTED

6.  Grievances herein were exhausted administratively by OAH decisions on July 21, 2022 and September 6, 2022 on the due process complaint filed on June 13, 2022.

## FACTUAL ALLEGATIONS

### General Facts

7.  At 4:15 pm February 2, 2022 without prior notification that her special needs autistic son, who was enrolled at nonpublic school Anova, specializing in educating autistic children, was sent written notification by the local educational authority ("LEA") Miller Creek that her son's enrollment at Anova was being immediately terminated.

8.  LEA Miller Creek refused to conduct a manifestation determination review (MDR) in conjunction with the termination to determine whether JM's conduct leading to his disenrollment was related to his autism disability under which he was placed in special

COMPLAINT - 2

education and at Anova under 20 USC § 1400 et seq (*Individual Disabilities Education Act ("IDEA")*.

9. A "MDR" is required by law under conditions we describe below.

10. The February 2nd, 2022 termination followed three (3) Email reports over a six (6) week period from December 16, 2021 to January 25, 2022, from two (2) therapists conducting weekly therapy sessions with the student via computer that the student had engaged in tantrums and was cussing.

11. Of the two principals terminating JM, MCSED of Miller Creek had never laid eyes on the boy in her life, and AAD of Anova had not seen JM since March, 2020, a span of nearly two (2) years since the lockdown and distance learning began.

12. JM had been enrolled at Anova since 2018 following two unsuccessful stints in public schools arising from autism related issues in the classroom. Anova welcomed him in 2018 with full knowledge of his history.  In October, 2019, Anova submitted two "Incident Reports" in one day on his autistic related behavior, i.e., kicking and cussing in the classroom,

13. At no time before his termination was JM's mother advised that her son's enrollment could be in jeopardy.

### Amplifying Substantive and Procedural Facts

14. Anova school had a "Code of Student Conduct" per 20 USC § 1415(k)(1)(A).

15. JM had "straight A's" on his report card in all subjects during the 2020-2021

COMPLAINT - 3

academic year, a year that owing to the pandemic saw Anova switch to distance learning earlier in March, 2020 and, for JM, extend into the first semester of the 2021-2022 academic school year owing to his pediatrician's recommendation that he remain away from the classroom until fully vaccinated.

16. JM's mother ensured Anova and Miller Creek were informed of her intent to have JM fully vaccinated upon his return to campus.  She did so voluntarily notwithstanding neither school required vaccine status out of deference to privacy policy.  Plaintiff queried both schools on July 1, 2021 with the recommendation that vaccines be mandatory, and received the response "Anova does not mandate vaccination…(W)ith the state not requiring eligible students to be vaccinated, Anova will not be privy to the vaccination status of the students enrolled."

17. JM's extended semester of distant learning was programmed to end in February, 2022, with the intended availability of a vaccine for JM's age group by that time, as indeed the IEP team convening December 15, 2022 concurred with his February return to campus for live classroom instruction.

18. JM's mother was the first of the IEP team to brief others on her son's emerging rebelliousness as the pandemic extended into its second year with distance learning becoming more challenging, the mother's briefing given at the December 15, 2021 IEP team meeting that had been convened for preparing his return to the classroom.

## The Path to Termination

19. A member of that IEP team monitoring the 12/15/2021 meeting, a therapist

COMPLAINT - 4

accessing the boy one hour a week in therapy sessions, sent an Email to Anova's academic director ("AAD) and other colleagues the next day following her weekly session with JM.  In a rhetorically sensationalistic tone, the bulk of her Email reported the opening few minutes of the boy's tantrum with his mother in which SML was attempting to get her son calmed down to get him focused on his therapy session.  The therapist's opening salutation was: "30 minutes of the F word."  The following described her Email scenario:  "arguing with Mom," "a scene screaming and yelling," "screaming and cursing," "give me my F—ing donut," "language was intense," "I wish you were F—ing ripped up," and "I wish you were dead."  Only at the end of the Email, did the therapist describe her actual therapy session with the Student, instructing him on "deep breaths," and that:  "he told me to F—off repeatedly."

20. The therapist's Email, copied to MCSED by AAD, began the 48-day period leading to JM's February 2nd termination.

21. A second therapist, i.e., the speech therapist, likewise accessing JM for a once weekly session, and copied on the first therapist's email, sent two (2) similarly framed Emails on JM's cuss words and tantrums in January, 2022, doing so on January 11th and January 25th.

22. The speech therapist's January 11th Email reported: "Another argument," "shouting," "some hits."

23. The speech therapists' January 25th Email reported: "(JM) screamed at me throughout the whole session, mostly "F..k you and you idiot."

COMPLAINT - 5

24. MCSED, in charge of JM's placement at Anova, reported in an Email the following in discussing its role in the termination, that "Service providers were reporting that (JM) was regularly cursing at the laptop, turning over furniture, and hitting his mother."

25. On January 25th after the 3rd Email from therapists reporting JM's cussing and tantrum's, AAD instructed MCSED to inform JM's mother that the boy's placement at Anova remained guaranteed so long as he returned to the campus by February 15th, the date SML had indicated to Anova would be the completion of her son's final COVID shot.

26. After having instructed MCSED to tell SML her son had a guaranteed slot at Anova if he returned by February 15, AAD reneged on her promise, stating in her own words to MCSED in her 5:25 pm email that she had been "thinking about (JM)…"

27. AAD's first transcribed thought after "thinking" about JM at 5: 25 pm was that she had been: "reading the back-and-forth Emails between the specialists who are seeing him."

28. She continued: "He isn't making any progress and spends the majority of the time yelling and swearing at staff."

29. AAD continued: "I don't feel that we are going to be able to meet his needs on campus.  We can continue to support him with independent study while you are looking for another placement, but I don't think it is a good idea for him to come on to campus and think it will be a set up for him and not successful given where he is right now…"

30. AAD's suggestion for an IEP team meeting followed: "Do you think we should schedule an IEP to discuss."

COMPLAINT - 6

31. With the January 25th Email, Julian's regular teacher, teaching him daily by zoom in the same manner as the two therapists, whose first reaction was "Yikes" when reacting to the therapist's 12/16/21 email, gave an updated status to her colleagues who had all been following these emails:

> "(JM's mother) told me she has a cyst in her ear and has a doctor's appointment on Thursday.  She left (JM) alone for most of the call today. He called me a lot of names, but rarely screamed.  Sorry to hear.  I know she was super tired after this weekend and didn't have the energy today. She told us he would get internet regardless of his behavior since she didn't have energy."

32. MCSED answered AAD's email of the evening before with "I will reach out to Mom again today.  I left a message yesterday with no answer.  I think it is important to emphasize that she will lose her...(sic)...place in Anova."

33.. In the meantime, no further incidents on JM were reported after January 25th as he continued his distance learning on a daily basis.

34. Nearly a week's lull followed.  Finally at 7:16 pm February 1st AAD emailed MCSED "Did you hear back from Mom?"

35. Right away at 8:31 a.m. the next morning, MCSED responded "She "won't answer the phone on me, I called several times," adding "I will Email her today to see if she responds."  She concluded that a colleague "was able to secure a place at Hunt if she is willing to change schools."

36. MCSED never sent the Email to JM's mother that she stated at 8:31 a.m. that she would preparatory to any decision. She initially testified under oath that she had, but on cross-examination conceded that the only email she sent was the February 2nd 4:15 pm one notifying JM's mother of the termination.

37. Returning to the morning of February 2nd, thirteen (13) minutes later at 8:44 a.m. AAD emailed MCSED starting with the question with "Should I do a formal 20 day notice?" This referred to subsection (a)(4) of California Education Code ("EDC") § 56366's contract termination clause governing individual service agreements ("ISA") between a public school and nonpublic school ("NPS") to provide free appropriate public education ("FAPE") to an individually named special needs student—that requires "20 days"—but also requires that the party initiating the termination of the student's ISA must have cause, i.e. "termination for cause," to do so.

38. AAD continued: "(JM) really isn't getting anything out of the independent study but I don't want to leave you in a bind and it is fine for us to keep going. Either way works for us but if it would help you to tell…(SML)…we don't feel we can meet his needs anymore we can do that" then adding her second suggestion of the IEP, i.e. "Or maybe we need to schedule an IEP? She usually shows up for those."

39. Three (3) minutes later (8:47 a.m.) MCSED shot back "Let's do both. That way we can expedite the discussion and I can hopefully get a placement secured at Hunt."

40. Eight (8) minutes later (8:55 a.m.), AAD sent a final proviso to MCSED: "I feel

strongly that he shouldn't come back on campus, but we are fine doing the…(independent study)…for as long as you need us to. I'm just concerned that he isn't accessing much."

### Termination

41. The only Email sent to JM's mother on February 2nd was MCSED's 4:15 pm Email informing her that her son was being terminating from Anova effective immediately. It read:

> "Dear (SML). I hope you are well. I am hearing reports from Anova that (JM) is really struggling with his online program. The school feels strongly that (JM's) needs another placement (underline plaintiff's emphasis) and will be sending us a letter ending (JM's) enrollment as Anova. I would like to explore Hunt school for placement for (JM). See attached release of information. Please sign and return this document so that we can explore Hunt as a placement option for (JM)."

42. Anova never notified SML in writing that her son's enrollment was terminated.

43. AAD telephoned SML the next morning, i.e. February 3rd, described in SML's July 12th testimony at the hearing as follows:

> "(S)he let me know that…(JM)…was not coming back, and I was dismayed by this because she didn't give any indication of this before…she said…an admission on her part… 'You know even before…the pandemic, we weren't sure that we could have…(JM)…back. We weren't sure that we could handle hm…he was hurting people before that time. He really

> hurt a lot of people' or something to that effect...(as)...all of this was kept
> hidden during the entire pandemic."

44. A writen notice of termination from Anova did not exist until nearly two (2) days after MCSED's notification of termination, finally coming at 2:56 pm  February 4th when AAD forwarded Email notification to MCSED under her account but in the name of Anova's founder and CEO, stating:

> "Dear Philippa.  Please consider this correspondence to be  20-day prior
> written notice of termination regarding the ISAa between Anova and Miller
> Ceek UntionSchool Disrict.  Per today's date of 2/4/2022, the contract
> for...(JM)...is being terminated as per the terms of the CA Ed Code and
> the terms of the Master Contract.  Our last daya of service will be 2/25/2022
> for the current academic school year.  Thank you very much for the
> eopportunity to serve your student and for your confidence in Anova
> programs.  Please do not hesitate to contact me should you have any
> question or concerns.  With best regards, Andrew Bailey, MA, MFT,
> Founder, Anova."

45. Anova's February 4th termination notification was never provided to JM's mother, nor was it even offered by Miller Creek.   On February 8th SML's attorney had to request a copy from Miller Creek, and was then provided it by MCSED.

46. Plaintiff protested the illegality of the termination in February Emails to Miller

COMPLAINT - 10

Creek and Anova. Plaintiff stated then, and it would be repeated continuually that further nonpublic school ("NPS") placement would be unacceptable until Miller Creek practiced the policy that NPS students would be treated equally with public school students in due process rights when changes in placement are initiated by the LEA. It was communicated to Miller Creek that the shock and trauma of an unexpected and abrupt expulsion of an autistic child forced upon a single mother struggling to raise her child is not a situation SML would voluntarily put herself in again. Accordingly it was explained she requested future placement in a public school where the threat of immediate termination by simple edict of the 20-day notice would not be possible.

47. No "cause" under subsection (a)(4) was identified by Miller Creek as that statute requires as a condition precedent for operability. Only when Miller Creek's sole witness, i.d. MCSED, was cross-examined at the August 16, 2022 due process hearing was an answer provided on what was the "for cause" basis for JM's February 2nd termination. MCSED responded: "They could not meet his needs. They stated they could not—they stated that could not meet his needs."

### No Manifestation Determination Review ("MDR")

48. At no time subsequent to the time the decision was made to terminate JM, was a manifestation determination review ("MDR") discussed, initiated, offered, or conducted by Miller Creek to evaluate the relationship between the "yelling and screaming at staff" that Heidi Adler described in her January 25th Email that got JM terminated and his autism disability that was documented to qualify him for IDEA placement into Anova.

COMPLAINT - 11

49. Miller Creek's justifying rationale for the February 2nd termination was stated by MCSED's February 14th Email to plaintiff in which she said:

> "To clarify, Anova's termination of (JM's) placement was not an expulsion. The master contract between Anova and the SELPA (on the District's behalf) includes a provision that either the nonpublic school or the District may terminate the placement with 20 days' notice. This provision in the contract is required by law, and does not require an IEP team meeting, or District/parent agreement. For those reasons, the notice from Anova ends Anova's involvement in (JM's) education." The next paragraph read: "Miller Creek School District is committed to ensuring that Julian's education continues uninterrupted. For that reason, and because Julian's IEP requires placement in a nonpublic school, I have secured a space for Julian in another state-certified nonpublic school—specifically at Irene M. Hunt School in San Anselmo. <u>We are ready to move forward with that placement upon termination of the Anova program, and with the parent's consent.</u>" (underline plaintiff's emphasis)

### March 16th IEP

50. A March 16, 2022 IEP Team meeting followed. Plaintiff's efforts to place JM in a public school setting were briefly entertained by Miller Creek in discussions at the 3/16 IEP session. After having agreed to convey the request to Marin County Office of Education ("MCOE"), MCSED reported on April 22, 2022 that MCOE "feel that they

COMPLAINT - 12

are not able to meet (JM's) needs in a county program. This puts us back to exploring non-public school options."

51. At the March 16th IEP, MCSED's explanation on the events surrounding JM's termination from Anova vastly differed from that she espoused earlier, but didn't waver from her insistence Anova—not she—was the central player ordering the termination. The 3/16 IEP minutes were summarized as follows in the quotes below provided by Marin County SELPA's ("Special Education Local Plan Area") recorder:

    (a) In regard to events a month and a half earlier, "(MCSED) shared that ANOVA contacted her by phone…(regarding JM's termination)…to let her know that ANOVA would be providing a 20-day-notice."

    (b) "(MCSED) responded to ANOVA…(regarding the termination)…by requesting that they consider waiting until…(JM)..returns to campus before making a determination that they could not meet his needs," and

    (c) "(MCSED went on to share that ANOVA should have waited and attempted to implement the behavior intervention plan before making the determination that his needs could not be met. This was expressed to ANOVA in her 2/1/22 phone call. (MCSED) shared that ANOVA has stated in previous IEPs that they could not meet…(JM's) behavioral needs and it is in…(JM's)…best interest to find a school that will support…(JM)…in making progress with his behavioral needs."

### May 25th IEP

52. The next, and final IEP team meeting to date to place JM occurred on May 25, 2022,

COMPLAINT - 13

was similarly unsuccessful, a transcript of which is available for this U.S. District Court for the extraordinary events therein experienced.

53. Presiding over the IEP, MCSED declined on May 25, 2022 to articulate any semblance of Miller Creek standards under which a special needs autistic child's needs must be met with and only through NPS referral.  This followed, upon plaintiff's questioning, what facilities/services Miller Creek School District had within it own jurisdiction to possibly serve JM, to which MCSED responded:

> "So the question you're asking or requesting, is that…(JM)…be placed on a comprehensive campus…in the middle school program at Miller Creek? (to which plaintiff answered "Yeah, it was within your jurisdiction, one of your public schools.  That was what I requested, yes."  MCSED responded: "Right, and first moving forward for sixth grade, we only have one middle school option, and that is, currently, a special day class program at the middle school, which is a mild to moderate program for students with learning disabilities."  Plaintiff responded:  "(C)onnect that with…what you said a couple minutes ago about a nonpublic school setting.  I didn't quite get the transition between the nonpublic school setting and Miller Creek" to which MCSED responded "So (JM's) offer is a nonpublic school setting…that's where, that's what his current offer of FAPE is."

54. At the May 25, 2022 IEP meeting, plaintiff's representative stated that—whether or

COMPLAINT - 14

not the placement is public or private—the classification of the placement was less important than due process--was stated as follows, and indeed a statement not at all inimical to NPS :

> "I actually—if the truth be known, I think…(JM)… should be in a private school…but he's not going in a private school until Miller Creek honors due process rights in a private school is the same as a public school."

55. At the May 25, 2022 IEP team meeting, MCSED, immediately after plaintiff and she exchanged differences on the issue of due process on forced placement changes affecting NPS enrollees, twice requested the collective IEP team to concur with her proposal that only NPS sources were available for JM. No concurrence of any IEP team member followed MCSED's solicitation of support. The transcript of the proceeding, one Miller Creek counsel conceded was accurate, confirms that no IEP team support was voiced in response to her solicitation.

56. Nevertheless IEP paperwork forwarded to SML the next day for her to approve and sign listed only "NPS Settings" for her son's placement. It had 14 categories of academic and service areas for which Miller Creek had assigned as "NPS". In short JM's mother was presented an IEP document to sign that Miller Creek knew to be false.. Miller Creek had pre-marked a "check" in the box indicating "The IEP team discussed and determined were" choices and options the IEP team never endorsed. Substantive disagreements notwithstanding, Miller Creek's falsification of IEP documentation depicts the District take-it-or-leave it approach to what by law in required to be a collaborative school-parent

COMPLAINT - 15

approach under IDEA.  While disagreements inevitably occur, falsifying records of IEP proceedings as Miller Creek did with the May 25th IEP proceeding exacerbated an already unfortunate situation.

## Due Process Complaint June 13, 2022

57.  On June 13, 2022 plaintiff filed a due process complaint with OAH.  In adddition to Miller Creek, plaintiff filed against Anova as a respondent as well.

58.  Plaintiff did not initially request "expedited" process, but OAH designated the complaint as entailing both "expedited" and "non expedited" allegations.  Accordingly the expedited hearing was set for July 12, 2022 and the non-expeicted hearing was, with one extension, set for August 16, 2022.

59. Anova requested dismissal for lack of OAH jurisdiction.  Dismissal was granted based on June 30th on the ALJ's citation of state law, e.g. the Education Code, as the sole basis for the jurisdictional reach of the Due Process hearing in question.  Plaintiff opposed Anova's dismissal, citing statutory construction principles and 20 USC § 1415(c)(2)(B)(i) in which Congress established that "other parties" besides "local educational agencies" are subject to and must respond to federal due process complaints. Plaintiff also opposed on the basis of the Master Contract between Miller Creek and Anova  in which Anova promised to participate in due process hearings at the request of the LEA.

## The July 12th Due Process Hearing

60. The issue of the "expedited" July 12th due process hearing per the ALJ's order was

COMPLAINT - 16

whether Miller Creek violated 20 USC § 1415(k) when JM's enrollment at NPS Anova

was terminated at February 2, 2022.

61. Plaintiff's sole witness was SML, JM's mother.

62. Miller Creek's sole witness was AAD ("Heidi Adler").

63. Neither party designated any expert witness for the hearing.

64. SML testified on July 12th that she chose Anova for her son in 2018 because:

    (a) "the District kept advocating and pushing for (JM) to have a placement at Anova,"

    (b) that nobody "from Miller Creek or Anova ever suggest(ed) to..(her) that (JM's)

        enrollment was in jeopardy,"

    (c) that she signed Anova's proposed behavior intervention plan ("BIP") before the

        2021-2022 school year because "They wanted me to sign it…(but) I didn't see

        how it was pertinent because he was still in distance learning,"

    (d) and further about Heidi Adler's call to her on the morning after MCSED sent the

        termination notice, specifically referencing Anova's deceit in withholding from

        her their doubts and reservations about JM's worthiness for Anova enrollment.

        SML testified Adler told her " ' (E)ven before the pandemic, we weren't sure

        that we could have (JM) back.  We weren't sure that we could handle him…we

        weren't sure he was a good fit. He was hurting people before that time. He really

        hurt a lot of people'…or something to that effect…And it's like all of this was

        kept hidden during the entire pandemic…I find that incredibly damaging and I

        find it very inhuman—in humane that they would keep that knwledge from me

that they didn't know if they even could have him back, and then not even give

him a change to try to come back to see if they could handle him. I mean, if they

really coundn't, that would be one thing, but they didn't even give him the

chance to try to come back in person. And, you know, you can't treat children

that way, espeially disabled children like that…had I known that they were so

ambivalent whether they could keep him in the first place, I could have started

looking for other schools then. I could have taken over his schooling when he

was still prepubescnet, when he was just eight, you know, nine years old, he was

a more delightful child to work with outdoors and he had more confidence back

then, and they basically stole that—those year and a half from and and (JM)

when it could have been, you know a really great opportunity for hands' on

learning and—instead they had him sit so they could get paid, and the, you know,

they get the funding for their school that could handle kids with behavioral

problems, so they should have been forthrigh about that…"

(e) SML testified on the impact of the termination: "(S)o traumatic…it propelled me

into…having a nervous breakdown…and my health has deteriorated greatly

from that nervous breakdown, which I have health problems anyway…it's just

disillusioning and devastating…this school didn't have his back as a disabled

child, and that's what their job is…it would be one thing if they said…(JM's a

really hard case…in the public school…they never did that…and then I even did

what they wanted and signed their behavior intervention plan, and they still and

then they just dropped the ball…right upon his return…They should have at least

let (JM) return to school and see how it is, at least see how it is and try…Instead,

he was just expelled…They led me to believe the best way to get him back to

Anova was to hold on to this base contract we had, and that was not the case.  It

was terminated before he could even step foot on the campus."

65. AAD, i.e. Heidi Adler, was Miller Creek's only witness at the July 12th hearing.

She testified thusly:

(a)   Anova had a "Code of Student Conduct,"

(b)   that Anova "had a written policy for student discipline,"

(c)   that prior to the March, 2020 shift to distance learning for all students, JM's
      aggressive behaviors were "scratching, kicking, biting, sometimes pinching,"

(d)   that as per the Email report on December 16th, JM's "behavior had increased,"

(e)   and "that escalating behavior continued(d) into January,"

(f)   and that in regard to that "there was a lot of yelling,"

(g)   "and on a few occasions I believe he hit mom;"

(h)   "and staff were just concerned about—about their safety,"

(i)   and that her concern was that "if he was exhibitting this behavior in his
      home…that we would see similar behaviors to what we had seen prior to the
      pandemic,

(j)   "and he is bigger and stronger" now,

(k)   and she had "concerns about…(Anova's) ability to implement his IEP in relation
      to providing virtual learning,"

(l) and that around this time she had "a conversation with (JM's mother) and talked about how (JM) was doing…and that she hadn't gotten the vaccine yet, and so it looks more like maybe February 15th that he would come back, but not February 1st that he would come back…and I was concerned if—if that much time had gone before his first vaccine, that whether he would have to start over again. I was just concerned that he wouldn't be able to come back to campus as we had planned,"

(m) and testified she first learned about the 20-day notice contract termination procedures when at "Kent State University" in Ohio where she did graduate studies,"

(n) then immdiately corrected herself that it was "when I moved to California and worked in the public school,"

(o) and that it was her belief "that the 20-day notice procedure of contract termination procedure…(EDU § 56366(a)(4))… prevails over any other IEP Team requirement prior to a change of placement,"

(p) that in regard to seven (7) hour and twenty (20) gap in time between AAD's 8:55 a.m. February 2nd Email to MCSED and the latter's 4:15 pm terminating Email to JM's mother insisted the two "may have spoken on the phone"

(q) but when pressed about it conceded "I don't recall:"

(r) and further conceded "it could have been zero" times they spoke on February 2nd,

(s) and testifying further when asked why in lieu of Mr. Bailey's nearly  two full day delay of signing the Anova's official termination notice on 2:56 p.m. February 4th did MCSED send termination notice on Febaury 2nd, admitted "I—I don't know;"

(t) and when asked her reaction when learning MCSED had actually sent the Email terminating JM, testified "I wasn't surprised" when she learned that MCSED had in fact forwarded the terminating Email at 4:15 pm;

COMPLAINT - 20

(u)   and testified the decision to terminate JM was made after January 25th;

(v)   and further testified that Anova, during her tenure there, had issued "maybe ten" terminations of students under the same circumstances as JM;

(w)   and when asked why she didn't insist that an IEP team meeting be convened as the discussion to terminate JM progressed, testified "I believe I did;"

(x)   and when asked when she did that, she cited her two "Emails"(January 25th and February 2nd) she had sent to MCSED.

66.  It was during Adler's cross examination that plaintiff's counsel attempted to have the therapist's December 16, 2022 "F word" laced Email read into the record.  Miller Creek objected.  Plaintiff's counsel offered to read it into the record of proceeding himself, stating "it's the dynamic I'm seeking here, I'm trying to get a psychological profile of what caused this particular series of three Emails to change the whole curriculum of (JM) here," The ALJ sustained the objection.  The mere placement of all the Emails into evidence, which was allowed, denied the factfinder and one reading the transcript of the hearing the true psychological foundation of the frenzy that caused this expulsion.

67.  Counsel also attempted to probe Ms Adler's state of mind on why she placed such emphasis on weekly therapists' reports and effectively ignored JM's daily teacher who by Anova's delegation of responsibility had enormously greater circumspection of the bigger picture of JM's educational and psychological status than the former.   This attempt went nowhere as Miller Creek's counsel immediately objected, with the ALJ sustaining the objections.  The effect of the denial to read into the record the profanity laced Email that was the lynchpin of the path to termination and denial to challenge the core judgment of AAD in deciding to pursue termination based on sparse and recent input

COMPLAINT - 21

of only marginal players in JM's education, effectively denied the plaintiff the tools of a rigorous cross examination. The watered down orders to "rephrase" challenging questions allowed Adler the time to regroup and ultimately provide her evasive answer: "I don't really have an opinion."

68. Plaintiff's closing argument of July 12th argued in the affirmative that Miller Creek violated 20 USC § 1415(k) when terminating Student February 2, 2022; arguing "wrongful termination, and that Miller Creek, not Anova actually launched what plaintiff called the "nuclear option" in terminating JM's nearly three and a half year tenure at Anova that Miller Creek unjustly used the pandemic as a wrecking ball to end. Plaintiff's closing argument indeed, based on the evidence, was that Anova—and Miller Creek, indeed obfuscated what was the former's frustration and punitive use of disciplinary measures while using as a pretext altruistic motives that termination was best for JM. Not one, but two principled legal frameworks were at play and violated, e.g. statutory frameworks on Due Process generally under § 1415 was breached, and the "student code" framework (addressed below).

69. Miller Creek's closing and supplemental written argument from July 12th rested on the all-consuming subsection (a)(4) presumed by the LEA—and Anova—to be the absolute power to terminate students under the law regardless of due process provisions spread throughout several statutes. Heidi Adler's testimony, cited, was that no disciplinary consideration was in play in Anova's termination of JM. Nor was termination the result of any violations of Anova' code of conduct was her testimony.

Rather it was their determination, Adler testified, that they could not meet his needs as the IEP required.

70.   In her final brief before the ALJ's July 21st decision, Miller Creek's counsel argued plaintiff was wrong, missing "the point of this state law requirement, which exists to ensure that a master contract can be terminated in order to ensure that a student is provided with a FAPE." (underline plaintiff emphasis)

71. The "master contract's" termination (supra "69"), a fiction of unknown origin in this dispute is totally irrelevant.   The entire dispute was—and is—of the ISA's termination that cut off JM's education.   (See "Bailey" termination Fact 44)

### ALJ "Expedited" Decision July 21, 2022

72. As the ALJ ruled for Miller Creek, i.e. "Miller Creek School District did not violate…1415(k)…when Student's enrollment at Anova…was terminated by correspondence from Anova…dated February 4, 2022.  Miller Creek prevailed on the Expedited Issue."

73. Of his July 21st decision generally, the ALJ was equally caught up with Miller Creek's argument that the "Master Contract" was seemingly the dispute.  After stating that plaintiff's argument that JM's behavior in December/January was due to autism—and quickly rebuffing it with the statement that  "the evidence did not support this contention"—the ALJ in his next sentence effectively copied Miller Creek's strangely bizarre brief that somehow the dispute was over the master contract, state:

> "The Master Contract (underline plaintiff emphasis) between Anova and
> Miller Creek provided that the agreement may be terminated with or without

COMPLAINT - 23

cause by either party, and that pursuant to California Education Code section 56366(a)(4), either party shall give 20-day written notice of the termination."

74. But as to the pivotal issue of § 1415(k) student codes the expedited July 12th hearing was convened to address, the ALJ's in clearing Miller Creek stated:

> "The contract termination had nothing to do with Student violating a school code of conduct, but instead reflected Anova's inability to continue serving Student's needs." (July 21st decision page 8)

75. The ALJ then cited Heidi Adler's testimony, "Adler opined that Anova's decision to terminate the agreement was not related to Student's outburst…Student offered no credible evidence that contradicted Adler's opinions."

76. In his July 21st decision, the ALJ made no mention of the statutory interpretation issue—or alternatively constitutional application--that plaintiff had argued for to correctly interpret EDC § 56366. Plaintiff's detailed brief on the gamut of statutory interpretation principles all suggesting Miller Creek's interpretation of subsection (a)(4) was erroneous warranted no mention in the ALJ's decision—not even to debunk it as is customary for a judge disagreeing with a party's argument.

77. In his July 21st decision, the ALJ stated "neither party offered any facts that Student's enrollment at Anova was terminated on February 2, 2022." This statement, contrary to the clear facts that MCSED launched the termination on the 2nd, depicted the ALJ's practice of conclusionary legal conclusions to avoid reasoning the components and building blocks to allow one reading the opinion to make a cogent analysis of the factfinder's path to the decision.   (re the ALJ's conclusionary approach, see also Facts "113" and "119(b)."

COMPLAINT - 24

78. In his July 21st decision, the ALJ stated "As soon as Anova provided notice of termination, Miller Creek identified a suitable placement for Student within the 20-day period, which Parent rejected." (See Fact "124" and invalidity of Hunt as substitute placement."

79. In his July 21st decision, the ALJ stated "Student offered several emails exchanges amongst representatives of Anova, as well as emails between Anova and Miller Creek as evidence that Student's bad behavior had escalated due to his autism."

80. In his July 21st decision the ALJ concluded "Student was also not deprived of education services during the 20-day notice period. As soon as Miller Creek received the termination notice, Miller Creek secured a spot for Student at the Hunt nonpublic school. This was communicated to Parent on February 14, 2002, which was within the 20-day period Anova was still providing services. Parent chose to reject that option and did not move forward with the proposed IEP meeting. Any delays in having Student return to school placement were not caused by Anova's termination notice." (See again "124").

### The ALJ Denied Plaintiff's Request for Recusal

81. In anticipation of the upcoming second hearing on "Non-Expedited" matters, plaintiff respectfully requested the ALJ recuse himself.

82. The requested recusal was based on the ALJ's silent but absolute commitment to § 56366(a)(4) as interpreted by Miller Creek, to wit: applying it without question or doubt, e.g., "cause" or "no cause" and regardless of its impact on the due process rights

COMPLAINT - 25

otherwise at play in the stage of a forced placement change of the student.   The mere ruling in the July 21st decision incorporated the ALJ's commitment to Miller Creek's absolutist interpretation of § 56366(a)(3).  Having ruled thusly, plaintiff contended it was virtually a legal impossibility for the ALJ to rule differently in the second hearing out of the pure logic that such would invalidate the absolutist application of (a)(3) in the first hearing.   As a critical legal argument plaintiff put forth in the first hearing to invalidate the termination, exactly the same argument was necessarily to be presented in the August 16th hearing as well.  Moreover, there was "factual overlap" between the two motions, a fact the ALJ himself subsequently agreed with in the August 16th hearing that followed. Having committed to Miller Creek's argument in his July 21st decision, i.e., not even addressing plaintiff's argument or the statute itself, any adoption of plaintiff's continuing argument to that end in the second hearing would necessarily invalidate the framework of the entire July 21st decision.   Plaintiff sought recusal especially on the basis of California Civil Code § 170.1 that provides recusal for the judge if s/he believes the interest of justice would be served, there is doubt as to his or her capacity to be impartial, or if "a person aware of the facts might reasonably entertain a doubt that the judge would be impartial."

83. In denying recusal, the ALJ stated "the standards applied at an expedited hearing are strictly limited to the requirements of Title 20 of the United States Code, section 1415(k)," and that the standards "at the non-expedited due process hearing are broader."

**August 16th Non-Expedited Hearing**

COMPLAINT - 26

84. At the August 16th hearing the issue to be decided, with both parties concurring, was whether Miller Creek denied Student a FAPE by removing him from Anova without Parent's permission and without an IEP meeting prior to change of placement.

85. Plaintiff chose oral argument August 16th, e.g., a one-hour oral argument based on Emails, the master contract, and JM's ISA admitted into evidence, and called no witnesses.

86. Miller Creek's sole witness was MCSED.

87. For the first time in the dispute, including months earlier and back into 2021, neither Miller Creek nor Anova mentioned "location" in the context of educational placement of the special needs child under *20 USC § 1400 et seq (Individual Disabilities Education Act ("IDEA))*.

88. That changed August 16th during Miler Creek counsel's opening statement. She then stated referencing student's June, 2021 IEP that

> "(T)he District's offer of placement was a quote 'nonpublic school, parenthesis (NPS), under contract with SELPA or District," end quote. The parties understood that the location (underline plaintiff emphasis) in which the IEP would be implemented continued to be Anova."   Later in the opening statement, she repeated "location": "In this phase of the hearing in this case, the issue, as has been redefined this morning, is whether the District denied (JM) a FAPE by removing him."   Then defying what she had agreed to earlier defining the hearing's issue of whether her client

COMPLAINT - 27

denied FAPE by terminating the student "without an IEP meeting prior to change of placement?" she went on to state "We would argue that it wasn't actually a change in placement. It was a change in location to implement the agreed upon nonpublic school placement."

89. Miller Creek's counsel solicited on direct examination of her lone witness, MCSED, the answer from what she alluded to in the opening statement, by asking at the time of the June, 2021 IEP meeting "what was the location where that IEP was to be implemented, if you recall?" to which MCSED responded "the location was a continued placement in Anova."

90. Into the hearing, the ALJ intervened to stop a straightforward cross examination seeking Miller Creek's sole witness's from answering a logical follow-on question to her testimony that JM's forced change of school from Anova in Santa Rosa, California to Hunt school in San Anselmo, California was not a "change in placement" but a "change in location." The next question was "Why is that?" to which MCSED's response was "not, (sic) they're both nonpublic schools."

91. With the aforesaid explanation that it was a change of location, plaintiff's counsel's next question was "What if you would propose a non-public school in Los Angeles, would that be a change of placement from Anova?"

92. Miller Creek's counsel promptly objected "I'm going to object to the relevance of that question, hypothetical." Plaintiff's counsel responded "Well, the relevance is your whole position is it wasn't a change of placement and I'm challenging that. I say it was a change

COMPLAINT - 28

of placement and I'm asking her, and she—you said San Anselmo was not, so I'm asking—I'm carrying this to the extent---"

93. The ALJ cut off plaintiff's counsel "Mr. Farber, please, please you need to stop speaking objections. Her answer was she viewed it as a change of placement, so I believe she answered the question.  So whether it's non—NPS in San Anselmo, or is in, you know, Nome, Alaska, it's the witness's response is that she would not view that as a change of placement.  If that's a change of location to what I understand.  If that's different, Ms Rosenblatt, you can correct me."

94. Plaintiff's counsel could only say: "Okay.  You answered it better than she did, Your Honor."

95. MCSED testified that Ms Adler's communications to her just prior to termination was that she "advised(ing) that Anova expected to issue a 20-day note terminating (JM's) enrollment at Anova."  That was false.  <u>Anova asked MCSED what to do!</u> (See "37")

96. MCSED testified in direct examination that just prior to the termination "I tried to reach out to…(JM's mother)…, but I was not able to contact her.  I made some—a few phone calls and reached out to her via email, but I didn't hear a response."

97. MCSED later repeated her assertion "I sent an email..(to JM's mother). She had not responded."

98. MCSED's testimony was materially false as applied to the pre-4:15 pm February 2nd time period when MCSED sent the terminating Email to JM's mother, finally admitting on cross examination there was no Email she sent at all before the one terminating JM,

e.g., question "I'm asking you if you had sent her an email before that?" the response of which was "No."

99. MCSED and counsel stonewalled repeatedly. They denied that MCSED preceded Anova by nearly two (2) days in informing JM's mother that her son was being terminated. Regarding MCSED response "let's do both" to AAD's 8:44 a.m. email in regard to both the 20-day notice and IEP, the witness was asked "did you do the IEP?" she responded "we scheduled an IEP, yes." Then she was asked "Before or after you notified (JM's) mother that he was being terminated?" to which Miller Creek's counsel stated "I object. That's that's not a fact in evidence. It was Anova that notified (JM's) parent," to which MCSED quickly agreed ""Yeah, I didn't notify (JM's) parents." Counsel continued "Anova was the one who provided the notification. It wasn't Ms Rosenblatt." MCSED agreed "I didn't notify her that he was being terminated."

100. Then reading her own email stating to JM's mother at 4:15 pm that Anova "will be sending us a letter ending (JM's) enrollment," MCSED finally admitted the truth "I did not intend to say that he was being terminated."

101. MCSED's evasiveness as Miller Creek's sole witness was profound, including:

(a) her inability to recall the extent to which she received guidance from Miller Creek's superintendent in handling the JM termination,

(b) her perplexity on even "what type of guidance you're talking about,"

(c) "I'm really confused about this. I'm sorry."

COMPLAINT - 30

(d) "I don't recall whether or not I spoke to anybody on February 2nd regarding (JM),"

(e) Asked whether she consulted with anyone on the JM decision on February 2nd, she said "I'm sorry. I don't understand what you mean about consulting with anybody."

102.    Plaintiff got nowhere questioning MCSED—the sole witness Miller Creek put forth to answer for them on August 16th--why students in Miller Creek get due process rights and students they place in nonpublic schools don't.

103.    The ALJ, as well, professed perplexity at plaintiff's concept of "due process."

104.    The ALJ asked plaintiff's counsel: "How do you define due process rights?"

105.    Surprised at the question, plaintiff's counsel responded: "I define due process rights as following the law, which would be requesting an IEP evaluation and have the IEP team meet have the IEP team discuss it with a parent involved, and then consider whether a revision to the IEP should be made per the CONTRACTOR's request.   That's what due process is!

106.    The ALJ's own perspective on due process that plaintiff urged, as above, was met with candor as he sustained Miller Creek's objection to cut off the questioning: "Okay…I'm going to sustain the objection.  I think a lot of what you're saying is argument, and I think a lot of it goes to your—your understanding or your belief that— and—and it's, it's a fair issue. I didn't look at it this way before or thought of it this way before, but whether or not Anova cancelling—so that's really an argument.  That's not really something she can decide. So I'm going to sustain the objection.  You can argue that it does.  That's certainly within your right."

### ALJ's September 6th Decision

107.   The ALJ's September 6th decision on the non-expedited portion of Case 2022060347 was likewise unfavorable to plaintiff with the finding that "Miller Creek did not deny Student a FAPE by removing him from Anova without parent's permission and without an IEP meeting prior to change of placement..(and finding that)…Miller Creek prevailed on the due process issue."

108.   In the September 6th decision, the ALJ stated "The contract termination had nothing to do with Student violating a school code of conduct, but instead reflected Anova's determination that it was unable to continue serving Student's educational needs,"

109.   In his September 6th decision, the ALJ stated in regard to the March 16th IEP meeting that as to Parent and Student's attorney "Both had no confidence that a different nonpublic school could meet Student's needs."

110.   A second time in his September 6th decision, the ALJ stated that "the evidence established that Anova's decision to terminate the agreement was not related to Student's behavior."

111.   In his September 6th opinion, the ALJ again stated plaintiff's family "were understandably upset that Anova terminated abruptly without their knowledge or consent, by law…"   This statement was materially false.  Plaintiff make no such argument that her consent was ever required in a dispute over placement."  (See "118(c) and (d)

112.   In his September 6th decision, the ALJ stated "Student also offered no legal

COMPLAINT - 32

authority which would have required an IEP team meeting prior to the issuance of the 20-day termination notice…(and)…no legal authority which would have required an IEP team meeting prior to the issuance of the 20-day termination notice."

113.   The aforesaid fact "112" was conclusionary and based, without any reference by the ALJ to his basis for asserting it, upon the finding that the expulsion from Anova and forced movement to Hunt school was a "change of location" and not a "change of placement."

114.   The ALJ dealt with his omission of issuing a finding on the "placement" versus "location" debate merely by noting elsewhere in his decision that "Student argued that Miller Creek's failure to do so constituted an improper change of placement and a denial of FAPE.  Miller Creek argued that this was not a denial of FAPE, that Anova's termination was not within its control, and that it constituted a change of location only."

115.   In his September 6th decision, the ALJ made no mention that plaintiff's due process argument also entailed both parties' contractual obligations, e.g., Master Contract and ISA, to follow all special education laws and regulations, including the due process safeguards as well, and that both Miller Creek and Anova breached their contractual duties to enforce them.

116.   In his September 6th decision, the ALJ made no mention of Miller Creek and MCSED's refusal to obtain IEP Team consensus and the District's associated misrepresentation that the IEP paperwork presented to SML for her approval reflected

IEP team approval that her son's placements were recommended to all be NPS—when that was totally false.

117. At the August 16th hearing as Plaintiff's counsel was cross examining Miller Creek's sole witness, MCSED, the ALJ violated OAH rules, cutting off plaintiff from impeaching MCSED over a document she had submitted to higher authority which contained highly impeachable content which plaintiff's counsel had in his possession but not turned over as an exhibit.

    (a) OAH procedural hearing rules issued on August 8, 2022 for the August 16th hearing required advance disclosure of those exhibits to be used at the hearing "unless used solely for rebuttal or impeachment."

    (b) Plaintiff's plan was to impeach MCSED on that document; which was intended for impeachment and not disclosed in advance as the above OAH rules permitted. The document in question, i.e., a Miller Creek letter dated March 24, 2022 that MCSED admitted preparing was being held by counsel at his station during the hearing and easily capable of computer camera "zoom" clarity for a close examination. Plaintiff counsel began questioning MCSED on the document's contents and began to read from it to refresh her recollection as he started to question her.

    (c) Miller Creek's counsel immediately objected, claiming "I'm going to object being questioned on a document that's not been introduced into evidence and

COMPLAINT - 34

that I don't have an opportunity to view while Mr. Farber's questioning the witness about it."

(d) The ALJ responded "I'm going to sustain it" amplifying that "it wasn't submitted five days in advance and it's not part of the record, so I can't allow over Ms Tomsky's objection."

(e) Plaintiff was thus denied impeachment on a critical credibility issue when procedure specifically allowed it and would have easily been achievable in a courtroom as the document would have been handled directly to the witness for her and her counsel to examine it for further follow-on questions.

118. In his September 6th decision, the ALJ echoed the false argument Miller Creek made in charging plaintiff with the false argument that JM's mother was unreasonably demanding veto power over any placement issue put on the table by Miller Creek.

(a) In Miller Creek's final written brief following the 8/16 hearing but before the ALJ's September 6th decision, counsel insisted "Plaintiff's argument that…(SML's)…permission was required to initiate the twenty-day notice…(and that)…neither the law nor the Master Contract gives her that right…(with her)…consent not required as the District offered a change in location…"

(b) Miller Creek alluding to Parent's demand for veto power of any placement recommendation was totally false.

COMPLAINT - 35

(c)   In plaintiff's full hour's oral argument on August 16th, the word "consent" or "permission" was never uttered, not anything hinting of such veto power.

(d)   The ALJ's decision fully embraced it, however, stating in his ruling "At the due process hearing, Student contended that when Anova terminated its contract with Miller Creek...Miller Creek should have first held an IEP meeting to obtain Parent's input and consent to the termination..."

(e)   While true that Plaintiff complained of Miller Creek's rejection of an IEP team meeting, the ALJ's attribution that plaintiff demanded her "consent" to the outcome was totally inaccurate, constituting extreme bias to even suggest that.

(f)   Plaintiff's oral argument August 16th stated the core purpose of the IEP team approach under IDEA was a soft landing for any unpleasant reality placed on a reluctant parent. Plaintiff's counsel described what is the psychological dynamic that Congress envisioned between school and parent in establishing the collaborative but sometimes contentious IEP process, describing it as follows: "I put this in my own quotations—'soft landing'—the whole idea of an IEP is supposed to be a soft landing for what perhaps could be very bad news for the student and his parent. That's the whole idea of IDEA, of an IEP Team that's required by Due Process was intentionally shunned."

119.   In the ALJ's respective rulings of July 21st and September 6th both key holdings denying relief were purely conclusionary. Both lacked reasoning and building blocks upon which ALJ's lack of clarity can only be explained as bias.

(a) In the July 21st decision, the ALJ never stated whether or not he concluded JM did or did not violate an Anova code of student—the key question of the stated issue--and if so or not, on what basis and what facts.   He bypassed the issue by merely agreeing with Anova's witness assertion of a noble purpose, the decision stating  "The contract termination had nothing to do with Student violating a school code of conduct, but instead reflected Anova's inability to continue serving Student's needs."

(b) Likewise, the pivotal question of the August 16th hearing whether or not JM's forced expulsion was a "change of placement" or merely a "change of location" the answer of which changes the entire legal calculus, the ALJ's conclusionary result ruling for Miller Creek failed to explain anything or attempt to justify his conclusion.   Mere citing both parties' respective contentions, e.g., Student = "change of placement" Miller Creek "change in location" the ALJ rested on "Student offered no legal authority which would have required Miller Creek or Anova to consult with Parent prior to the issuance of the 20-day termination. Student also offered no legal authority which would have required an IEP team meeting prior to the issuance of the 20-day termination notice."

**Subsequently**

120.   As of the date of this filing, i.e., October 14, 2022, JM's's plight of 254 days that Miller Creek's has denied him FAPE continues to degrade his social and emotional status as JM's absence from school exacerbates his autistic drawbacks.

COMPLAINT - 37

121.   On July 30, 2022 SML signed a records release to authorize Miller Creek to transmit JM's records to selected NPS entities out of her most urgent concern that her son's education was her highest priority, and a modification of her earlier reluctance to do so that Miller Creek's erring ways would be remedied, by judicial action or otherwise, by the time the 2022-2023 academic year commenced.

122.   On information and belief, one NPS in Mill Valley, CA that Miller Creek nominated for JM's placement and was attractive to SML and the boy himself, rejected his enrollment request, we contend, solely on the basis of the unjust February 2, 2022 expulsion which blotted the boy's reputation and suitability among educators to avoid what the paperwork showed was a troublemaker kid.

123.   One other NPS nominated by Miller Creek apparently was willing to accept JM. However its location on the rural outskirts of Sebastopol, California and its housing and residency of what we were told were severely troubled youth with juvenile records was determined by JM's entire family to be unsuitable for the boy's placement.

124.   Hunt school in San Anselmo, California, the one MCSED insisted was a proper one for JM's "change of location" for its identical "nonpublic" status with Anova, does not enroll students in JM's category of autism—so said a Miller Creek official to plaintiff's representative in early September, 2022. This rendered SML's reluctance to instantaneously acquiesce to MCSED's 4:15 pm Email of February 2nd terminating her son in which it stated only that they would "explore options" with Hunt a correct decision. Accepting it would have caused another disruptive change of placement as the parties

COMPLAINT - 38

realized that JM must be moved again—or with the realignment, be maintained in a school with other children incompatible with his needs.  In short, Miller Creek and MCSED's haste to move JM without an IEP Team consensus and without her doing the proper homework to study Hunt, was unlawful then and proved capricious now.

125.   In the meantime, Miller Creek, despite continued requests, refuses to change whatever policies it has, e.g., MCSED refused to shed any light on their policy substance at the May 25, 2022 IEP team meeting, amply illustrates the barrier to parent-school communications that Miller Creek built, and that denies JM his right to education under California's Constitution, as the boy continues to languish at home without school mates aiding his social growth.

### Claim for Relief ONE
### (Against Miller Creek)
### (Declaratory Judgment)

126.   All of the preceding and succeeding contents of this complaint are hereby incorporated into this claim.

127.   Miller Creek and Anova violated virtually the entire range of Due Process procedural safeguards required by federal and state law when they decided to end JM's placement at Anoa while further excluding his mother from the entire process.  This breached, as well, Miller Creek's contractual obligation of the Master Contract and ISA, violations and breaches delineated in paragraphs "67" through "75" of plaintiff's June 13, 2022 Due Process complaint.

128.   It should be declared, and plaintiff requests this court do so, that EDC § 56366

was never intended by the Legislature to be the wrecking ball of Due Process that Miller Creek—with the ALJ's approval—unleashed to wipe away chapters and sections of IDEA protections Congress and the Legislature crafted over years to protect disabled children.   Therefore, this court, in interpreting § 56366, should order such Due Process protections remain undisturbed as other provisions of contract principles affecting contracts between Miller Creek and their NPS affiliates remain enforceable.

129.   It should be declared, as principles of statutory interpretation and construction reveal, that JM's termination and expulsion, was an unlawful application of subsection (a)(4) of the statute.

130.   Further, it should be declared, school districts administering master contracts and individual service agreements ("ISA") have a public duty to enforce such contracts evenly and without detriment to donee third party beneficiaries as JM was in this case, and which Miller Creek refused to do.  The public rightfully expects Miller Creek to be duty bound by its public obligations to the public and public school students, and ensure its bargaining power is not voluntarily diminished by undue deference to private contractors as happened in JM's case.

131.   The "cause" to which subsection (a)(4) references to justify contract termination shall not, as here, include student affairs within the foreseeable scope of educational administration, as that is an improper statutory purpose the Legislature did not validate.

132.   It should be declared, as well, that the JM's forced disenrollment of February,

2022 was legally a forced "change of placement" and not a change in "location" as the legislative history and case law clearly demonstrate.

133.    Alternatively, subsection (a)(4) of EDC § 56366, as applied by Miller Creek and Anova, is preempted by 20 USC § 1415's due process requirements for disabled students.

134.    Alternatively, subsection (a)(4) of EDC § 56366 as applied by Miller Creek and Anova. is preempted by the Equal Protection clause of the U.S. Constitution, in that similarly situated special needs children relying on public schools for education were and are treated disparately by Miller Creek, those as JM are subjected to arbitrary expulsion at the whim of the CONTRACTOR school without due process rights, but those under placement at a Miller Creek public school are not subject to such denial of due process rights. Proper coordination by the LEA with the CONTRACTOR school prevents what Miller Creek insisted was the inevitable legal power to of Anova to terminate as they wish.  In point of fact the LEA administers the master contracts and ISA's with total leverage over CONTRACTOR schools in the form of the contract specifications.   This is empowering for the LEA to enforce contracts, e.g., specific performance, to compel NPS's to honor the special education laws regarding compliance with special education due process requirements which, here, the LEA totally disregarded as a tool to force compliance with IDEA, the incentive of which compels NPS to avoid paying costs and attorney fees in any venture to breach contracts made with LEA's to educated disabled children.

**Claim for Relief TWO**
**(Against Miller Creek"**

COMPLAINT - 41

**(FAPE Denial in Terminating Student in Violation of 20 USC § 1415(K)**

135.    The preceding and succeeding contents of this complaint are hereby incorporated into this claim for relief.

136.    The ALJ's July 21st decision was a product of legal error, bias, and abuse of discretion for utter disregard of the clear and unambiguous language of § 1415(k).

137.    As LEA, Miller Creek's refusal to convene a manifestation determination review ("MDR") within ten (10) school days of JM's February 2022 termination from Anova was a violation of the clear and unambiguous statutory command requiring the MDR. This also requires immediate reversal of the July 21st decision that ratified the gross error denying the student the most basic due process procedural safeguard in the Act.

138.    The entire weight of the ALJ's multitudinous justifications for his decisions rested on the purported inviolability of subsection (a)(4) of EDC § 56366, thus eradicating the entire range of arguments why due process an FAPE were casualties in this dispute.

139.    The July 21st decision wrongfully held that "opinion," e.g., and opinion by an interested party that had a stake in the outcome, prevailed over the objective standard required by 20 USC § 1415(k)(1)(E) in determining whether an MDR was required.   The ALJ was persuaded—and so ruled—that Ms Adler's opinion that "Anova's decision to terminate the agreement was not related to the Student's outbursts" would preempt the objective standard governing MDR.  The ALJ even added to that, that "Student offered no credible evidence that contradicted Adler's opinions."

140.    The ALJ's path taken is not the law—it is contrary to the law.  The operative

COMPLAINT - 42

provisions of § 1415(k)(1)(E) and continuing to (F) state:

> "(W)ithin 10 school days of any decision to change the placement of a child with a disability **BECAUSE**…(bold caps plaintiff emphasis)…of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team…shall review all relevant information in the student's file, including the child's IEP, any teacher's observations, and any relevant information provided by the parent to determine….(and goes on to state if that review determines that the conduct was a manifestation of the child's disability, various steps shall be taken by the IEP Team, options for the team then detailed in items (i) (ii), and (iii) that followed. (Ibid)

The ALJ expended two (2) pages of his decision explaining Heidi Adler and Anova's credibility and that JM's mother was offered new placement that would not have interrupted her son's education—and turned it down—all totally irrelevant to the statutory requirement of the necessity to convene a MDR to evaluate JM's outbursts in December/January to determine whether they were manifestations of his autism. Plaintiff's submitted evidence clearly illustrated the decision to expel was based nearly exclusively on the entire range of emails reporting JM's cussing and tantrums, triggering the MDR automatically. This more than carried the burden of proof and persuasion as presented by plaintiff. That the decision to expel was not at all related to JM's autism but AAD's self-serving "opinion" of a noble purpose by Anova was an abuse of

discretion by the ALJ, a decision made by lay people without any expert testimony to back up the Anova official's self-serving testimony.

141.    The "student code" statute, i.e. 20 USC § 1415(k) was ignored by the ALJ. The word **BECAUSE** is critical and pivotal to the meaning of the statute and does not—did not—permit the ALJ to give exclusive deference to Ms Adler's opinion. This was bias most obvious (supra) by his immediate follow-on comment that "Student offered no credible evidence that contradicted Adler's opinions."   Student had no need to rebut Adler's opinion.  Addler's opinion was not exclusive to all the factors § 1415(k)(1)(E) required the ALJ to weigh—but did not—in concluding Adler's opinion was dispositive of the entire issue.  The ALJ allowed and facilitated Adler's "opinion" to trump every other factor required by the statute in weighing the appropriateness of convening an MDR.

142.    Absurdity characterizes the notion Anova's—and Miller Creek's—"decision" to terminate JM was without regard to violations of student codes.  Of course he was terminated **BECAUSE**—and only **BECAUSE**—he yelled "F**.k you," "you idiot," his "tantrums," "arguments," "kicking," "screaming and yelling," "shouting," "waking up all the neighbors,", "biting," and that "he called me a lot of names."  Neither can Heidi Adler hide from her emails, e.g. "I've been thinking…I've been reading the back-and-forth Emails between the specialists who are seeing him…he isn't making any progress and spends the majority of the time yelling and swearing at staff."

143.    But allowing the absurdity that Heidi Adler's "opinion" embracing altruistic principles cast aside the multitudinous reports of student code violations in the

COMPLAINT - 44

aforesaid paragraph as driving Anova's termination decision, it doesn't work to Anova's favor as, in the law, judges and lawyers understand the concept of concurrent or multiple causes of an event.    In California the jury system, i.e. CACI No. 431 "Causation: Multiple Causes" instructs on the principle precisely.  There can be more than one cause for the decision to terminate JM, even if here the ALJ chose Adler's opinion as the only factor in it.    To comply with the statute, "BECAUSE" must incorporate all the "concurrent" causes leading to the termination.  To deny the multitudinous violations of student codes were factors leading to the termination takes irrationality to a new level.

144.    Nothing better demonstrates the pretext for the termination than Heidi Adler's "concern" that JM's vaccine booster might have to be delayed for medical reasons.  (see Fact 65(l))  That concern, according to Adler, could have further delayed his return back to Anova from the February 15th scheduled date that JM's mother had indicated would be his return date to campus.   This was Adler's pretext for what really were disciplinary reasons for terminating the boy.   Not to mention Adler probing into "medical" issues of which she presumably has no competence, poking herself into JM's vaccination status in which Anova's privacy policy proclaimed complete confidentiality for students and staff in regard on their COVID vaccination status illustrated an improper motive to do whatever it took to justify JM's termination---issues that LEA Miller Creek and MCSED either negligently failed to discuss with Anova, or joined with them to intentionally inflict an unjust termination.

145.    MCSED too, in her Email report explained JM's expulsion as "regularly cursing

COMPLAINT - 45

at the laptop, turning over furniture, and hitting his mother."

146.    JM's is not a profile that pleases this party, but is one that reminds of the injustice rendered by Miller Creek and Anova in disregarding the protections of the law that should have been afforded JM.   In his mother's attempt to get her son back to school after struggling for 21 months in a once a century pandemic requiring distance learning the entire time, the insensitivity of the termination and violation of law aligned.

147.    Violations in this claim for relief constituted denial of FAPE and should be rectified by legal remedy requested in the Prayer for Relief.

### CLAIM FOR RELIEF THREE
### (Against Miller Creek")
### FAPE Denial by changing JM's placement without IEP Involvement

148.    The preceding and succeeding contents of this complaint are incorporated into Claim for Relief THREE.

149.    The ALJ committed reversible error as outlined in facts "90" through "94."   It was a material abuse of discretion for the ALJ to prevent plaintiff's counsel from cross examining Miller Creek's sole witness on her very questionable, and lay testimony that the forced move from Santa Rosa to San Anselmo was not a change of placement but merely a change of location.   The ALJ's injection of himself on the "Los Angeles" question and then taking over the witness's testimony to answer that "Nome, Alaska," would be consistent with MCSED's same testimony is reversible error

150.    Facts "87" and "88" illustrate Miller Creek's late minute change to transform all

the due process procedural safeguards required by IDEA for a "change of placement" of the student to a mere "change of location" under the law that requires only an order by the LEA and no IEP Team processing.

151.     The ALJ's professed perplexity of plaintiff's notion that an autistic student's forced move to a brand-new school after the current school expelled him requires IEP concurrence, e.g. "I didn't look at it this way before or thought of it this way before" personifies bias for school Districts and against parents in a most troubling way.  It is one thing to rule against a party, but another to be baffled by a most common and reasonable contention as plaintiff's.

152.     Miller Creek's theory that JM's forced move from Anova to Hunt school in San Anselmo was only a "change of location" and not placement defies virtually the entire embodiment of communications that entailed even Miller Creek and its allies used in 2022 to describe JM's situation.  They used "placement change" et al regularly in referring to JM's forced movement out of Anova, and only at the end when legal realities were setting in did Miller Creek and counsel shift to "location" to facilitate their legal strategy.

153.     MCSED herself testified "Anova's termination to (JM's) placement was not an expulsion" during her August 16th testimony.  (underline plaintiff emphasis)

154.     MCSED's testimony August 16th referred a second time to "placement," stating "that's why we were looking to secure a place at another certified nonpublic school, and specially at the Hunt school, and that we were ready to move forward with placement."

COMPLAINT - 47

(underline plaintiff emphasis)  With her mind not "lawyered" up, MCSED naturally and rightly called these issues "placement" and not "locations."  She couldn't have said it more forthrightly—and legally correctly when she said with obvious candor trying to distance herself from her wording on her February 2nd 4:15 pm Email terminating JM: "They don't—they're not meeting his needs. That we need to look at another placement." (underline plaintiff emphasis)

155.    Heidi Adler also was a disciple for "placement" as MCSED listened, telling the Miller Creek official on January 25, 2022 that Anova would continue supporting JM and her "while you are looking for another placement" for JM.

156.    Neither did the ALJ in his September 6th decision state or conclude that Miller Creek's proposed transfer of JM from Anova school in Santa Rosa, California, 45 miles away to Hunt School in San Anselmo, California was—legally—not a change of placement but a change in location.

157.    The ALJ's refusal to call it a change of "location" during his September 6th legal analysis and conclusion ruling for Miller Creek is all one needs to know to reject the disruptive event in plaintiff's life as merely a change of "location" in the course of the family's lives.

158.    IDEA galvanizes around "placement" as central to the Act.  As was JM's February, 2022 expulsion a "change of placement."

## Prayer for Relief

159.    Wherefore plaintiff asks this Honorable Court:

COMPLAINT - 48

(a)  to order Miller Creek to establish immediately full educational and therapeutic services in their jurisdictional grounds to plaintiff, hiring a full time tutor if necessary to do so;

(b)  to declare the law as requested in Count ONE,

(c)  to pay for and compensate for weekly counselor services for plaintiff's rehabilitative needs for one year resulting from Miller Creek's violations of IDEA and legal harm to the plaintiff.

(d)  to expunge all records relating to JM's termination.

(e)  for attorney fees and costs.

(f)  for any other relief deemed just and appropriate by the Court.

Dated this 14th of October, 2022.

Donald J. Farber
Attorney for Plaintiff

COMPLAINT - 49